People agt. Phelps.

### Second Trial.

## ALBANY OYER AND TERMINER.

THE PEOPLE agt. CHARLES H. PHELPS.

*Charge of judge* WESTBROOK, *October 8th*, 1874, *on retrial of the case of Charles H. Phelps for grand larceny.*

As has just been intimated, gentlemen, by the court to the counsel in this cause, there are grave questions of law involved in it. With these questions, however, you have nothing to do. The court has disposed of them, and if the court is wrong a higher tribunal, before which the case may come, will correct it. You are to decide simply and only on questions of fact which the court will leave to you. You will not trench upon the prerogative of the court, nor find a verdict, either for or against the prisoner, upon your abstract convictions of the case. You are to pass upon this case and pronounce your verdict upon the evidence under the instructions which the court shall give to you applicable to that evidence. And let me say, preliminarily, that questions of fact must be found by a jury; questions of law are determined by the court. When questions of fact are to be passed upon by a

jury, I mean those questions which are really in dispute; that is to say, whenever there is evidence on both sides upon a question, or when there is a dispute as to the deductions to be drawn from the evidence, in either of those two cases the opinion of the court ought not to control the jury, for the verdict you must render, according to your oaths, must be based, not upon the judgment of the court nor upon its opinion on those questions of fact, but upon your own consciousness and upon your own convictions as to the right.

The indictment against the prisoner is for grand larceny, which, under our statute, consists in the felonious taking of some other person's property of greater value than twenty-five dollars against the will of the owner of the property. The particular piece of property which the prisoner is charged with stealing in this case is the draft which I hold in my hand, and that you may understand exactly the purport of the charge I will read it to you.

" FARMERS AND MECHANICS' SAVINGS BANK
OF LOCKPORT, N. Y.,
*August 7th,* 1873.

" $7,500.00.

"Pay to the order of S. Curtis Lewis, county treasurer, seventy-five hundred dollars.

"S. C. LEWIS, *Secretary.*

" *To* CENTRAL NATIONAL BANK, N. Y."

It is for the stealing of this draft that the prisoner stands indicted and is on trial. The facts of this case, gentlemen, I leave to you. I shall narrate them as I understand the evidence tends to prove them. If I am wrong in my narration of these facts, or in the conclusions to be drawn from them, you must correct me by your verdict.

This draft of $7,500 was sent by S. Curtis Lewis, as the county treasurer of the county of Niagara, to this city to comptroller Hopkins for the purpose of paying a part of the

state tax due from the county of Niagara. The draft is drawn, as you observe, payable to the order of S. Curtis Lewis, county treasurer, he also being the secretary of this bank. As it was payable to his order he indorsed it as follows :

" Pay Nelson K. Hopkins, comptroller, or order. S. Curtis Lewis, county treasurer."

In this form he remitted this draft to the comptroller's office. It was here received, and having been received at the comptroller's office it was undertaken to be transferred to the state treasurer and his office by this indorsement:

" Pay to order of state treasurer. Henry Gallien, second deputy comptroller."

Mr. Gallien swears that he either personally delivered the draft, when thus indorsed by him, to the hands of the prisoner, or it was sent to him by a messenger from the office of the state comptroller.

According to the evidence in the case (and I leave it to you to say if it is so proven) when the prisoner received this draft he entered it upon two books in the treasurer's office, he being in the office at the time when it came into his hands. It was entered upon the book 'containing the daily cash receipts of the treasurer's office, by which it appeared that on the eighth day of August the state received this draft from the comptroller. It was also entered upon the book which gives credit to the treasurers of the various counties of the state for payments of taxes, and entered on the eighth day of August in that book as an actual payment of $7,500 made by the county of Niagara into the state treasury.

Next we have produced to us this receipt. The filling up of it is in the handwriting of the prisoner. It is signed by the deputy treasurer of the state, Mr. Paul, and by Mr. Henry Gallien the second deputy comptroller. It reads as follows: " State tax: State of New York : Seventy-five hundred dollars ($7,500.00), treasurer's office, Albany, August 8th, 1873. Received from S. C. Lewis, treasurer Niagara county,

$7,500 on account state tax. Fulton Paul, deputy treasurer; Henry Gallien, second deputy comptroller." Now you have (if this be the evidence as I have stated it) this draft in the treasurer's office, entered upon the books of the office as one of the receipts into the treasury, and a receipt sent to the sender of the draft, filled up by the prisoner, by which the officers of the state, the state treasurer and the comptroller, admit the reception of the possession of this draft. The duty of Mr. Phelps, as we understand the evidence, then was to deposit it in one of the banks of deposit in this city. The particular bank for that purpose was the National Commercial Bank. He had, as we also understand the evidence (and upon that point the jury is to say), no discretion whatever in regard to it. He had no right to divert it for a single moment of time from the purpose to which the law and his instructions appropriated it. It was his duty to take that draft and deposit it in the Commercial Bank, or in some one of the other banks of deposit in this city. Instead of doing that, however, as I think evidence in the case shows, of that you must judge, he places this indorsement on it: "Pay to C. Hudson, Esq., cashier, or order. State treasurer, per C. H. Phelps." This was then sent to F. R. Sherwin & Co., of New York, of which firm C. Hudson, Esq., was the cashier. Mr. Sherwin delivered this draft to his cashier, and it having been indorsed by such cashier was deposited in the Bank of North America, in New York, to the credit of F. R. Sherwin. It did not go into the state treasury, nor did the state treasury have the avails of it; that is admitted in the cause. It went where the prisoner sent it. It was sent where he directed it, and was paid where he directed it to be paid, and that was in a different place from that in which the law and his specific instructions required it to be placed.

The next fact which seems to be proven in the case, and I leave it to you whether it is proven or not, is this: That the prisoner went to Jersey City, and when he was seen by Mr. Raines, in connection with Mr. Brown, he admitted that he

was a defaulter to the state, and he could not tell whether the amount of the deficiency was greater or less than $200,000. He could only answer that question when he could consult his books or his memoranda in the office. He further said to Mr. Raines and to Mr. Brown that if he could be guaranteed his freedom for the space of thirty days he thought that he would be able to return most of the money, and if he could be allowed his freedom for the space of two or three months he thought he would be able to return the entire amount of money. Upon his being asked to tell where the money of the state was he refused to give the information; and when Mr. Raines told him that he could be punished for this offense he said to Mr. Raines that he had consulted with counsel and that he had been guilty of no crime which could bring him back to this state for trial : he had only been guilty of a mere breach of trust. There is no direct evidence in this case that in this conversation he specially referred to this draft. The conversation was in regard to the general deficiency in the treasury, of which, it is claimed, this particular draft makes a part. You are to find, from this conversation, whether or not any portion of it refers to this particular transaction.

These are, as the court understand them, the facts in the case. I do not say to you that they are matters of law, because it might be improper, in a criminal case, for me to say here that they are the facts. I leave it for you to find whether they are or not from the evidence. If, however, the foregoing statement which I have made to you is true, then it shows that the prisoner did appropriate this draft to his own use ; that he appropriated it to his own use without any right whatever, and I may as well here make a remark in passing that no officer of the state, from the highest to the lowest, could give him the power to use the people's money for his own purposes. I know of no evidence in this case tending to show that any officer of the state, has given him permission to use it. On the contrary, there is some evidence in the case tending to show that no officer did give

that right.   He wrote to Mr. Raines and informed him of his inability to make up his accounts, and from the terms of the letter it is apparent, we think, that Raines had given no such consent.   When Mr. Raines saw him in Jersey City, if the relation of that conversation be correct, nowhere in that conversation did he insist or intimate for a moment that any official had given him the right to use this money.

I repeat, then, if the foregoing statement of this case, as I have given it· to you, be correct, then the evidence in this cause shows that without right and without justification the prisoner took this money and converted it to his own use. The sending of the draft is proven by the evidence of Lewis and the letter which accompanied it.   The reception by the comptroller is proved by Mr. Gallien, and the indorsement thereon by such officer, and also by the indorsement which the prisoner made on the back of the instrument.   Its receipt in the treasurer's office is proven by the entries on the books in the treasurer's office, by the positive evidence of Mr. Gallien, by the receipt forwarded by the prisoner to Mr. Lewis for it as so much cash paid into the treasury of the state; and, I might add, is also proven by the very indorsement which the prisoner has made on the back of the instrument.   Its being sent to New York and appropriated by the prisoner, contrary to the laws and contrary to his instructions, is proved by the evidence of Mr. Hudson, by the indorsement of the prisoner, by the evidence from the Bank of North America showing that it went into that bank according to the order of the prisoner.

Now I say, gentlemen, to you, that if you find that the evidence establishes the facts as the court understands them, and as the court has presented them, then it follows that the prisoner unlawfully took and appropriated this draft to his own use.

Another question, gentlemen, of fact, which I must submit to you in the case, and that is:  Did the prisoner take the draft with the intent to appropriate it to his own use, against the

will of the owner, feloniously? That I may not be misunderstood on this point, I will read you, gentlemen, the definition of larceny. I read from second *Wharton's Criminal Law*, section 1750, which is as follows:

" 'The definitions of larceny,' said baron PARKE, an eminent judge, 'are none of them complete. Mr. East's is the most so; but that wants some little explanation. His definition is ' the wrongful or fraudulent taking and carrying away by any person of the mere personal goods of another, from any place, with a felonious intent to convert them to his (the taker's) own use, and make them his own property, without, the consent of the owner.' This is defective, in not stating what is the definition of 'felonious' in this definition. It may be explained to mean that there is no color of right or excuse for the act; and the 'intent' must be to deprive the owner-not temporarily but permanently, of his property. Cases also show that a taking of goods with an intent to return them is not larceny.' "

This seems to me to be a very fair and satisfactory explanation of what larceny is.

I charge that, gentlemen, to be the definition of the crime of larceny; and that to convict the prisoner of this crime you must not only find that he took the draft in question feloniously against the will of the owner, but you must also find that he took it with the intent to deprive the owner permanently of the property. But then in that connection, I charge you further, that you must judge of the intent of the party from what he does. If a person actually takes the property of some other person and uses it so that he cannot possibly make restitution of the property, that forbids the idea that that person intended only to deprive the owner of it temporarily. If the thief puts his hand into your pocket and takes from your pocket twenty-five dollars, and goes and spends the money, it would be, I submit to your judgment, quite ridiculous to say that he only took it for a temporary purpose, and, meant to return the identical money at some other day.

I admit, gentlemen, and charge the rule for which the counsel for the prisoner contends — that is, that there must be an intent permanently to deprive the owner of the possession of the property — that intent you must find from the evidence before you can pronounce the prisoner guilty; but I also charge you that you should not draw an inference that the intent was simply to deprive the owner of the property temporarily, if it is clear that the prisoner has willfully placed the property beyond his power to return it, and thus made its restitution to the owner physically impossible.

In some cases, gentlemen, for example as where a master's horse is taken by a servant simply to ride and then returned, and in other similar cases, where from the whole transaction it is apparent that there was no intent to deprive the owner permanently of the possession of the property taken, the taking, though against the owner's will, would not be larceny, and so I charge you.

But, gentlemen, I wish to charge you further — for I have no desire to evade any requests to charge — that if you find that the prisoner had, by an actual appropriation of this draft and its proceeds to his own use, put it beyond his power to restore the identical property; if you further find that there was no pecuniary ability on the part of the prisoner to make good the value of the property taken — that he is affirmatively shown to have been unable to restore this money obtained on the draft, when he was called upon so to do; if you further find that when he was asked in regard to it, that he only professed to be able to return a part of it, and he refused to state where that part was, then I further charge you, gentlemen, that the prisoner cannot escape conviction for the reason that when he took the draft and converted it into money he had the hope, as he alleges, at some future day, to be able to restore the value thereof in money, with the interest. The act is still larceny if the taking of another's property was without color of right, or authority, or excuse, and against the owner's will; if there was an actual conversion by the

person taking it, without the ability to restore it, even though the taker really hoped, at some future day, to be able to restore its actual value in money.

You, then, gentlemen, are to find this question of intent. You are to find whether or not the prisoner took this property intending to appropriate it to his own use, against the will of the owner, without the color of right, authority or excuse, and intending to deprive the owner of it permanently. I leave this as a question of fact for you to pass upon under the rules of law that I have given to you.

There is another question, gentlemen, on which I shall charge you, more for the purpose of giving the counsel for the prisoner the benefit of an exception and to explain my views on several of the requests to charge, than because it involves a question which you are to decide. It is, gentlemen, a rule of law, that the owner of property stolen must have had possession of the property at some time to constitute the offense of larceny; and if Mr. Phelps always had the possession of this draft (I use the word "*possession*" as contrary to, and distinct from, the word "*custody*") from the beginning down to the time of its actual conversion, he could not be convicted of the crime for which he stands indicted; and that you may the better understand this principle I will read:

" It will be seen hereafter that when goods are delivered to a servant for his master, and the servant steals the goods before they have arrived into the master's possession, this is not felony at common law; though it is otherwise when the goods have reached their place of destination, when constructively the possession of the master begins. What, then, is the place of destination? It is reached when the goods have been placed in the master's wagon, even though it is driven by the servant; and if after this the servant steals them from the wagon, it is larceny."

The extract I have read is from the second volume of *Wharton's Criminal Law* (7th edition), section 1830.

Now, if you can find from this evidence under the rules of law that I shall lay down to you, that Phelps had possession of this draft from the beginning down to the time of its actual conversion by him, you could not convict him of the crime of larceny. On the contrary, you would be bound to acquit him. But I further charge you on this question of possession, that if this draft was sent to the comptroller and received by him at his office; if it was then delivered from the comptroller's office to the prisoner, he being at the time in the treasurer's office — I mean in the physical spot called the office of the state treasurer — and if it was there entered upon the two books to which I previously referred, and if the prisoner sent an acknowledgment to Mr. S. C. Lewis in the form of the receipt which has been produced in evidence, by which Fulton Paul, the deputy treasurer for the treasurer, and Henry Gallien, second deputy for the comptroller, admitted the reception and the possession of this draft by the state, then I say you cannot find from the evidence in the case that Phelps had possession of this property from the beginning down to the period of its conversion, in such a sense of the word " possession," as to exempt him from the charge of larceny.

And I further charge you on this same point, that if you find the facts of the possession to be as I have stated, then it is not material that you should find that Phelps formed the intent to steal this draft at the very instant that it was handed to him from the comptroller's office. He may have received it, not intending at that time to appropriate it to his own use ; but if he had received it from the comptroller's office, as I have mentioned, and as to that you are to say, and if upon receiving it it was entered upon the books of the treasurer's office, as I have mentioned, and if Phelps forwarded the receipt to which I have referred and called your attention, then no matter when he formed the intent to appropriate this draft to his own use, if he did form an intent so to do against the will of the owner, intending to deprive the owner perma-

nently of it, and carried such intent into actual execution, you must find the prisoner guilty of the crime of which he stands charged.

Now, then, gentlemen, it seems to me that your duty in this case is reasonably plain and clear. You are to find: First, whether or not Mr. Phelps appropriated this draft to his own use, whether this was done against the will of the owner and without color of right, authority or excuse; and, secondly, you are to find the intent with which he took it, whether that intent was felonious or not. I repeat, gentlemen, in passing upon this case you have no right to look at your own abstract convictions, except so far as they be founded upon the evidence which has been submitted for your guidance, and which you have sworn you will alone be governed by.

If the prisoner be right in the judgment which he gave to Mr. Raines that this was a mere breach of trust of which the law could not criminally take cognizance, a higher court will set this court right if it is wrong in holding and expressing to you a different opinion. Our convictions are very clear as to the nature of this case, if the facts be as the court understands them, but which facts you are to find. Integrity in places of public trust, the honest management of funds intrusted to the keeping of officers and clerks, require that this prisoner be found guilty if the facts, which you must decide, show him guilty. If, on the other hand, you find the facts to be not as we have detailed them to you, if there has been no appropriation of this draft, if the prisoner had no intent so to do and did not appropriate the draft in question to his own use permanently, without color of right, excuse or authority, against the owner's will, then it will be your prompt, your cheerful duty to acquit.